**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------

UNITED STATES OF AMERICA

v.

CHRISTY CORVALAN,

          Defendant.

------------------------------------------------------------

Case No. 23-cr-110 (MKV)

# GILEAD SCIENCES, INC., GILEAD SCIENCES IRELAND UC, AND GILEAD SCIENCES, LLC'S ANCILLARY PETITION FOR HEARING TO ADJUDICATE VALIDITY OF LEGAL INTEREST AND RIGHT TO FORFEITED PROPERTY UNDER 21 U.S.C. § 853(n)

Petitioners Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences, LLC (collectively, "Petitioners" or "Gilead") hereby make a formal claim to – and assert a legal right, title, and interest in – all or part of the specific property identified in the Consent Preliminary Order of Forfeiture as to Specific Property/Money Judgment (the "Subject Property"). ECF No. 252 at 1-2, 9-12.[1]

---

[1] The Subject Property is: (*1*) any and all funds in JPMorgan Chase Account number 762732029 held in the name of Success Re Management LLC, and any and all funds traceable thereto, including accrued interest (the "'2029 Account"); (*2*) any and all funds in JPMorgan Chase account number ending 9587 held in the name of Laconia Ave. Pharmacy Corp., and any and all funds traceable thereto, including accrued interest (the "'9587 Account"); (*3*) A 2022 Forest River Palomino Puma Trailer with vehicle identification number 4X4TPUH20NP09302; (*4*) the real property located at 3184 Wissman Avenue, Bronx, NY 10465, more particularly described as Lot 129, Block 5519 in the records of Bronx County, New York (the "3184 Wissman Property"); (*5*) any and all items seized by the government from the 3184 Wissman Property on or about March 2, 2023, see id. at 9-10; (*6*) the real property located at 3186 Wissman Avenue, Bronx, NY 10465, more particularly described as Lot 127, Block 5519 in the records of Bronx County, New York (the "3186 Wissman Property"); (*7*) any and all items seized by the government from the 3186 Wissman Property on or about March 2, 2023, see id. at 11-12; (*8*) a 2021 Mercedes-Benz Maybach S580 with vehicle identification number W1K6X7GB0MA003783; (*9*) a 2021 Nissan GT-R with vehicle identification number JNIAR5BF4MM160036; (*10*) a 2018 Mercedes-Benz C43 with vehicle identification number WDDWJ6EB2JF657374; (*11*) a 2017 Mercedes-Benz GLE 63 S with vehicle identification number 4JGDA7FBXHA814206; and (*12*) a 2022 Honda Odyssey with vehicle identification number 5FNRL5H64FB115845.

For the reasons set forth below, the Court should order that an ancillary proceeding be held to adjudicate the validity of Petitioners' claims and, at the conclusion of the proceeding, hold that Petitioners have superior right, title, and interest in the Subject Property as compared to Corvalan and the government, pursuant to 21 U.S.C. § 853(n).

**Relevant Background**

1. Petitioner Gilead Sciences, Inc. ("Gilead Sciences") is a public corporation organized under the laws of the State of Delaware. Its principal place of business is 333 Lakeside Drive, Foster City, California 94404. Gilead Sciences develops and markets a large portfolio of lifesaving medications, including drugs for the treatment or prevention of HIV. Gilead Sciences is the owner of certain well-established and famous registered trademarks that appear on the packaging (including the pedigrees), tablets, and instructional outserts of certain genuine HIV and other medications.

2. Petitioner Gilead Sciences Ireland UC ("Gilead Ireland") is a private unlimited company organized under the laws of Ireland, with its principal place of business at IDA Business & Technology Park, Carrigtohill, Co. Cork, Ireland. Gilead Sciences is the ultimate parent of Gilead Ireland. Gilead Ireland is the owner of certain well-established and famous registered trademarks that appear on the packaging (including the pedigrees), tablets, and instructional outserts of certain genuine HIV and other medications.

3. Petitioner Gilead Sciences, LLC ("GS LLC") is a private limited liability company organized under the laws of the State of Delaware, with its principal place of business at 333 Lakeside Drive, Foster City, California 94404. Gilead Sciences is the ultimate parent of GS LLC. GS LLC is the owner of at least one well-established and famous registered trademark that

appears on the packaging (including the pedigrees), tablets, and instructional inserts of certain genuine HIV and other medications.

4.      Defendant Christy Corvalan is a defendant in (i) the above-captioned action and, (ii) along with several other defendants in this case, one of Gilead's civil suits based on overlapping conduct, captioned *Gilead Sciences, Inc. v. Khaim*, 24-cv-4259 (E.D.N.Y.) ("*Gilead II*").

5.      Corvalan is the owner and principal of record of Island Pharmacy & Discount Corp. ("Island"). Island is also a defendant in *Gilead II*.

6.      Off the books, Corvalan owns and controls another pharmacy, Laconia Avenue Pharmacy ("Laconia"). Laconia is a defendant in a civil suit originally brought by Gilead in 2021, captioned *Gilead Sciences, Inc. v. Safe Chain Solutions*, *LLC*, 21-cv-4106 (E.D.N.Y.) ("*Gilead I*").

7.      In *Gilead I* and *Gilead II*, Gilead alleges that Corvalan, through Island and Laconia, sold millions of dollars' worth of counterfeit versions of Gilead's life-saving medications that treat or prevent HIV infections. Such counterfeits were obtained off the street from patients who received them for free or at a steep discount and agreed to sell their Gilead-branded bottles, empty or full, for a fraction of the bottles' original wholesale acquisition cost ("WAC").

8.      When Corvalan, through Island and Laconia, distributed these counterfeit Gilead-branded medications obtained from the street, she violated Gilead's trademark rights under the Lanham Act and put patients at serious risk with potentially life-threatening consequences.

9.      Corvalan's purchases and distributions of counterfeit medications undermined Gilead's quality control measures and were of a materially different product than Gilead sells. For example, the Gilead-branded bottles Corvalan sold contained the wrong pills,

had patient labels removed with harsh chemicals, and/or did not comply with the Drug Supply Chain Security Act's chain-of-custody tracking requirements. *See* 21 U.S.C. § 360eee-1(d)(1)(A).

10. Through the sale of counterfeit products in violation of Gilead's rights under the Lanham Act, Corvalan obtained reimbursements from pharmacy benefit managers, which in turn were reimbursed by, *inter alia*, public healthcare benefit programs, including Medicaid. As described below, **Gilead** then reimbursed a large portion of each Medicaid payment made to Corvalan, even though Corvalan distributed counterfeit versions of Gilead's medication, each of which caused Gilead to lose a sale.

### Gilead's First Civil Action and Cooperation with the Government

11. Laconia first came to Gilead's attention in July 2022 when a patient reported to Gilead that Laconia dispensed him counterfeit Gilead-branded HIV medication with the wrong pills in the bottle. The patient reported that Laconia had delivered to him what appeared to be a sealed bottle of GENVOYA®, but that after the patient had consumed one of the pills inside, he noticed that the pills had a different appearance than he expected, that the bottle had blue staining on the inside, and "smelled like paint." Gilead obtained the bottle from the patient and confirmed it was counterfeit.

12. Gilead contacted Laconia about the wrong-pill counterfeits for assistance in its investigation, but Laconia refused to cooperate.

13. Gilead thereafter named Laconia as a defendant in *Gilead I* in an amended complaint in August 2022 and immediately obtained a complete asset freeze against Laconia and its property. **Ex. A**. At the time, Gilead was unaware that Corvalan owned and controlled Laconia off-the-books.

14. In August 2022, pursuant to a court order, Gilead executed a seizure at Laconia, where it found a stash of 168 bottles of HIV medication, including 94 Gilead-branded bottles that had been purchased from patients for cash. Many of the bottles still had pharmacy patient labels attached, which indicated they had been dispensed by other pharmacies in the New York region before making their way to Laconia. Gilead also found several bottles of lighter fluid in the pharmacy used to remove the pharmacy patient labels, and a stack of envelopes each containing exactly $175 in cash, which was used to purchase the medications back from patients on the street.

15. Based on the foregoing and other evidence located at Laconia and obtained following the seizure, including a bank account in the name of Laconia for which Corvalan is the authorized signatory, Gilead determined that Corvalan was the off-the-books principal of Laconia and in charge of its counterfeiting operation.

16. On November 16, 2022, Special Agent William Fath of the Federal Bureau of Investigations ("FBI") inquired of Gilead's outside counsel whether counsel would discuss Gilead's filings in *Gilead I*. Agent Fath included on his communication representatives from the United States Attorneys' Office for the Southern District of New York ("USAO").

17. On November 18, 2022, representatives of Gilead met with representatives of the FBI and USAO to discuss *Gilead I*. Gilead's representatives provided to the USAO and FBI extensive detail into its investigation of Laconia and its actual owner, Corvalan. The USAO and FBI thanked Gilead for its assistance.

18. On November 22, 2022, Gilead received a grand jury subpoena from the USAO for all documents seized from Laconia. On December 1, 2022, Gilead coordinated the delivery of responsive materials to the government.

**Criminal Action Against Corvalan and Gilead's Second Civil Action**

19. On February 28, 2023, the USAO filed a sealed indictment in the above-captioned case against Corvalan and others ("Indictment"). ECF No. 1.

20. The Indictment includes much of the detail regarding Corvalan's conduct that Gilead included in its *Gilead I* pleadings and that Gilead's outside counsel reported to the FBI and USAO.

21. The Indictment also states that the "scheme had two sets of victims: government insurance programs and the patients." ECF No. 1 at ¶ 5. The Indictment, however, leaves out a third victim: Gilead. The "scheme" involved counterfeiting Gilead's life-saving medication (including through the distribution of at least one bottle with the wrong pills inside), then selling those bottles and obtaining reimbursements using Gilead's protected trademarks. As described below, this scheme deprived Gilead of sales and caused Gilead to pay improper rebates to the government for sales it did not make.

22. On June 17, 2024, Gilead filed *Gilead II* under seal. The next day, the court froze all of Island and Corvalan's assets, along with all assets she controls. That asset freeze order was converted into a preliminary injunction and is still in effect. **Ex. B**.

23. On July 15, 2024, Corvalan pleaded guilty to Count 1 of a sealed superseding indictment, charging her with conspiracy to commit healthcare fraud and wire fraud, in violation of 17 U.S.C. § 1349, pursuant to a plea agreement. **Ex C** at 3:20-25, 42:24-43:1.

24. Corvalan stipulated and agreed that she "caused patients with HIV to receive illegally sourced black market prescription HIV medication and offered to purchase HIV medication from patients who were prescribed that medication to treat their HIV infections." **Ex.**

**C** at 30:25-31:6; *see also id.* at 35:9-39:4 (admitting to conduct); *id.* 39:13-41:25 (describing government's evidence).

25. Corvalan agreed to restitution in the amount of $13,680,724.26. **Ex C** at 22:21-25. This amount represents the "loss to Medicare and Medicaid" calculated by the "delta between that which was billed to Medicaid and Medicare and that which was actually purchased from legitimate wholesalers." **Ex. C** at 39:24-40:5.

26. As part of the plea, Corvalan agreed to a Consent Preliminary Order of Forfeiture ("Preliminary Order"). ECF NO. 252.

27. The Preliminary Order includes "a money judgment in the amount of $3,920,724.26 in United States currency (the 'Money Judgment'), representing the amount of proceeds traceable to the offense" to which Corvalan pleaded guilty. ECF No. 252 at 2.

28. The Preliminary Order also included forfeiture of **Corvalan's** right, title, and interest in the Subject Property, including a JP Morgan Chase bank account in the name of **Laconia**. ECF No. 252 at 9. Gilead first froze this account, containing more than $1.1 million in counterfeiting proceeds, in August 2022. Laconia has since defaulted in *Gilead I*.[2]

## Gilead's Medicaid Rebates

29. According to claims data that the Centers for Medicare and Medicaid Services ("CMS") submitted to Gilead in support of rebate applications, a significant portion of the medications that Corvalan dispensed were Gilead-branded HIV medications.

---

[2] The asset freeze in *Gilead I* against Laconia remains in effect, and no party has sought to amend it. Furthermore, the asset freeze against Corvalan remains in effect in *Gilead II*, and she did not seek to amend it before purporting to forfeit her interests in the Subject Property.

30. Between 2020 and 2022, Island and Laconia submitted claims to CMS for 3,494 bottles of Gilead-branded HIV medications. CMS paid Island and Laconia approximately $9.42 million for those bottles.

31. In total, CMS reimbursed pharmacies associated with the defendants in this action approximately $15.4 million for Gilead-branded medications between 2020 and 2023.

32. Pursuant to both statutory and contractual obligations, Gilead reimburses CMS for every one of its medications dispensed to a patient enrolled in Medicaid at a set rate.[3]

33. CMS reimbursed Island $8,653,275.49 for Gilead drugs in 2020-2022. Of that amount, Gilead paid $5,318,360.58 in rebates to CMS.

34. CMS reimbursed Laconia $771,145.00 for Gilead drugs in 2020-2022. Of that amount, Gilead paid $527,069.49 in rebates to CMS.

35. Thus, in total, of the approximately $9.42 million CMS paid to Corvalan's pharmacies, Gilead paid approximately $5.84 million in rebates to CMS. Thus, in effect, CMS paid for only 38% of the reimbursements to Island and Laconia, while Gilead paid 62%.

36. According to the Consent Preliminary Order of Forfeiture, Corvalan and the government stipulated to a money judgment in the amount of $3,920,724.26, "representing the amount of proceeds traceable to the offence [to which Corvalan pleaded guilty] that [Corvalan] personally obtained." ECF No. 252 at 3.

37. The total recovery from the Subject Property – which includes at least $1.1 million in cash, several cars (including multiple Mercedes), and two waterfront properties in New

---

[3] Applicable rebate rates are determined by a combination of both statutory obligations and confidential contractual agreements between Gilead and the government. A summary of the rebate rates by medication and time period is being provided to the government and can be filed under seal at the Court's request.

York City – will likely exceed the *unreimbursed* portion of the stipulated loss amount that Corvalan personally obtained, i.e., approximately $1.49 million (38% of $3,920,724.26).

### Gilead's Rebates for Lost Sales

38. Gilead also lost sales because of Corvalan and her co-conspirators' conduct, then paid rebates to CMS for each of those lost sales.

39. The government calculated CMS's loss as "the delta between that which was billed to Medicaid and Medicare and that which was actually purchased from legitimate wholesalers." **Ex. C** at 39:24-40:5.

40. When a "legitimate wholesaler" sells a Gilead product to a pharmacy, it first purchases that product from Gilead. When medication is "bought back off the street" and reintroduced to the supply chain, **Ex. C** at 40:4-5, Gilead does not make an associated sale to one of its authorized distributors. In other words, were it not for the activity which caused Corvalan's requests for reimbursement from CMS to be fraudulent – distributing bought-back medications – Gilead would have sold each bottle Corvalan and her co-conspirators distributed.

41. Thus, Gilead both lost sales and, compounding its injury, provided "rebates" to CMS for the sales that never occurred.

42. In total, Gilead lost approximately $15.74 million on the bottles Corvalan distributed to Medicaid patients, comprised of approximately $9.90 million in lost sales revenue (the 3,474 bottes Corvalan dispensed multiplied by the price at which Gilead would have sold them) and approximately $5.84 million in improper rebates paid. The costs of goods sold on each additional pill Gilead manufactures, its only savings, are *de minimis*. By comparison, as noted above and factoring in rebates, CMS lost only approximately $1.49 million.

**Gilead's Interest in the Subject Property**

43.     Gilead has a legal right, title, or interest in the Subject Property. The funds held in the '2029 Account and the '9587 Account are, in whole or in part, the proceeds of Corvalan's counterfeiting scheme, of which Gilead was the victim. The remaining Subject Property was purchased, in whole or in part, with proceeds of Corvalan's counterfeiting scheme, of which Gilead was the victim.

44.     Further and in addition, Gilead sought and received an asset freeze order on all of Corvalan and Laconia's property, designed to "preserve security" in Gilead's ability to recover the equitable relief to which it is entitled. *Gilead Sci., Inc. v. Safe Chain Solutions, LLC*, 21-cv-4106 684 F. Supp. 3d 51, 62 (E.D.N.Y. 2023) ("The purpose of freezing assets is to preserve security for the plaintiff's future recovery on an accounting of the counterfeiter's profits." (cleaned up)). Gilead therefore holds a court-recognized interest in the Subject Property, specifically designed to secure Gilead's ability to recover Corvalan, Laconia, and Island's illicit proceeds. And Gilead obtained the asset freeze order against Laconia in August 2022, nearly two years before the preliminary order of forfeiture against Corvalan that includes the 9587 Account. Gilead obtained the Asset Freeze Order against Corvalan individually in June 2024, a month before the stipulated preliminary order of forfeiture in which she purported to give up her interest in the Subject Property.

45.     For the reasons set forth above, pursuant to 21 U.S.C. § 853(n)(6), Gilead has "a legal right, title, or interest in the [Subject P]roperty, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in [Gilead]."

46. Further, for the reasons stated herein, Gilead holds a constructive trust in the Subject Property, which overcomes the relation back provisions of 21 U.S.C. § 853 and is superior to the government's interest in the Rockaway Avenue Property. *See Willis Management (Vermont), Ltd. v. United States*, 652 F.3d 236 (2d Cir. 2011).

## **Relief Requested**

47. Petitioners hereby request that the Court hold an ancillary proceeding to adjudicate and recognize Petitioners' interest in the Subject Property.

Dated:  New York, New York
September 12, 2024

PATTERSON BELKNAP WEBB & TYLER LLP

*/s/ Daniel Ruzumna*

Daniel Ruzumna (druzumna@pbwt.com)
1133 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 336-2000
Fax:  (212) 336-2222

*Attorney for Petitioners Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences, LLC*

## **VERIFICATION OF CLAIM**

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on: September 12, 2024
New York, New York

*[signature]*

Lori Mayall, Sr. Associate General Counsel, IP, Gilead Sciences, Inc.

*On behalf of Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences, LLC*