*U.S. Department of Justice*

*United States Attorney
Southern District of New York*

*The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278*

November 19, 2024

**BY ECF**
Honorable Mary Kay Vyskocil
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

   **Re:**  *United States v. Christy Corvalan*, S1 23 Cr. 110 (MKV)

Dear Judge Vyskocil:

  The Government respectfully submits this letter in advance of sentencing in this matter for defendant Christy Corvalan (the "defendant"), which is scheduled for November 26, 2024. The defendant was a leader in a massive fraud that generated millions of dollars in profits by exploiting vulnerable patients with HIV. The defendant's scheme caused financial harm to government insurance programs in excess of $13 million. The defendant used the proceeds to buy waterfront properties, luxury vehicles, jewelry, and other luxury items. In consideration of the gravity of the offense, the need for the sentence imposed to provide significant deterrence, the history and characteristics of the defendant, the need to avoid sentencing disparities, and the other factors set forth in 18 U.S.C. § 3553(a), the Government respectfully submits that a sentence of at least 108 months' imprisonment is sufficient but not greater than necessary to achieve the purposes of sentencing in this case.

**A. Background**

  i. <u>The Offense Conduct</u>

   a. *Overview of the Offenses*

  From at least in or about 2020 through at least in or about 2023, the defendant was a leader in a scheme that defrauded Medicaid, Medicare, and private insurance companies out of more than $13 million through trafficking in black-market HIV medication. In doing so, she exploited at least hundreds of low-income individuals who had been prescribed HIV medication, jeopardizing the health and safety of those vulnerable patients. The defendant owned and operated two pharmacies from which the fraud was perpetrated, and she directed numerous pharmacy employees—three of which are co-defendants in this case and have been admitted into the Court's YAOP program—in all aspects of the scheme. That included procuring black-market HIV medication from illegal sources, altering the medication bottles to hide from her pharmacies' patients that the medication had previously been prescribed to others, submitting fraudulent billings to Medicaid and Medicare,

and even buying-back medication from her own pharmacies' patients that those patients should have been taking to control their life-threatening infections.

        *b. Background of the Regulation and Distribution of Prescription HIV Medication*

Prescription medications are of critical importance to treating many types of diseases, including HIV, and therefore, the movement, storage, and sale of these medications is carefully regulated. To ensure their safety, prescription drugs are typically sent from the manufacturer to one of only a handful of authorized wholesale distributors, who, in turn, either sell the prescription medications directly to pharmacies, or sell those medications to other licensed wholesale distributors who sell the medications to pharmacies for ultimate distribution to patients.

Prescription drug manufacturers set careful standards for the safe handling of prescription medications. For example: many HIV medications must be stored at precise temperatures. And on a more basic level, patients must never be given medication that is expired or that has already been dispensed to another individual. These standards must be upheld by all distributors who handle, buy, and sell prescription medication along the traditional drug supply chain. Failure to comply with these standards can impact the efficacy of the drugs and the safety of the patients receiving them. Maintaining the integrity of the prescription drug supply chain is, therefore, critical to ensuring that all prescription drugs remain safe for human consumption by the time they are ultimately distributed to patients.

The United States Food and Drug Administration ("FDA") is charged with protecting the health and safety of the American public, including by regulating the manufacture, distribution, and dispensation of prescription drugs. The FDA regulates the manufacture, distribution, and dispensation of prescription drugs through a number of laws, including the Food, Drug, and Cosmetic Act ("FDCA"), the Drug Supply Chain Security Act ("DSCSA"), and the Prescription Drug Marketing Act ("PDMA").

In addition to regulation of the prescription drug supply chain, the price paid for prescription drugs is also carefully controlled. Drug manufacturers generally set a Wholesale Acquisition Cost ("WAC") for the prescription medication they sell, that is, a price they charge wholesale distributors before the application of any rebates, discounts, allowances, and other price concessions. There is little deviation from the WAC for name brand, non-generic drugs that remain under patent. For this reason, drug distributors or dispensers who purchase prescription medication from the legitimate, regulated drug supply chain are generally unable to purchase that medication for substantially lower than the WAC.

Prescription drug distributors and dispensers are generally only able to purchase drugs at prices significantly below the WAC when they obtain those drugs illegally—that is, through means outside the legitimate, regulated drug supply chain. The term prescription drug "diversion" describes prescription drugs that are removed or "diverted" from the chain of lawful manufacturers, distributors, and dispensers. Prescription drug diversion typically occurs through several different unlawful means, including theft, fraud, or purchases also known as "buy-backs" from individual patients who never consumed the drugs they were prescribed. Diverted prescription drugs are often obtained and unlawfully resold by unlicensed distributors to other

unlicensed distributors, or directly to pharmacies, who ultimately dispense the diverted medication to patients.

By purchasing diverted medication, wholesale distributors and dispensers, such as pharmacies, are often able to obtain prescription drugs for substantially less than the WAC. However, when pharmacies submit a claim to Medicare or Medicaid, they receive the same amount of money in reimbursement—generally a payment at or near the stated WAC for a particular prescription drug—regardless of what they ultimately paid for the prescription drug. Purchasing diverted medication at lower cost outside the regulated supply chain therefore enables the pharmacy to earn a larger profit on each prescription medication it dispenses.

Prescription drug diversion, while profitable for unscrupulous distributors and pharmacies, disrupts the integrity of the regulated prescription drug supply chain. When prescription drug diversion occurs, the FDA is unable to properly monitor the manufacture, distribution, and dispensation of prescription drugs. Many diverted medications therefore lack indicia of authenticity or proper quality control. This lack of regulation puts patient health and safety at risk.

When enrolling in Medicare and Medicaid programs, pharmacies must attest that they will only submit insurance reimbursement claims for medication that was obtained and dispensed in full compliance with all applicable state and federal laws, including the FDCA and the DSCSA. However, the pharmacies involved in the fraud often billed government insurance (and sought full payment for) medication that was obtained outside the regulated supply chain and dispensed in violation of those applicable laws.

The fraudulent scheme generated significant profits for the defendant. Specifically, she profited as much as approximately $3,000 for each monthly prescription that her pharmacies filled.

This diversion scheme had two sets of victims: government insurance programs and the patients of the pharmacies.

*First*, Medicaid and other government insurance programs were defrauded out of more than $13 million in payments that they made to the Corvalan Pharmacies that are described in the S1 Superseding Indictment. Medicaid and other government insurance programs paid these pharmacies based on false representations by the pharmacies that the medication for which they were seeking reimbursement was procured and distributed in compliance with all applicable federal and state laws, including the FDCA and the DSCSA.

*Second*, the scheme exploited low-income HIV patients of these pharmacies, and in the process, potentially put those vulnerable patients' health and safety at risk. Modern HIV medication is very effective at controlling the symptoms of HIV. However, effective HIV treatment requires strict adherence to a prescribed medication regimen, with patients needing to take specific doses of specific medications each month. By purchasing diverted HIV medication from black-market sources instead of through legitimate distributors, the pharmacies could not assure the quality or condition of the medication they provided to their patients, thereby creating a risk that patients would receive counterfeit, expired, or improperly dosed medication. By purchasing medication from patients that they were prescribed to treat their HIV infections, the defendant also put their health and safety at risk by encouraging them to be deprived of their

prescribed medical treatments (*See* Final Presentence Investigation Report dated October 3, 2024 ("PSR") ¶¶ 24-45).

      *c.   The Defendant was a Leader in the Scheme and is Directly Responsible for More Than $13 Million of Fraud*

The defendant functionally operated two pharmacies in the Bronx—Island Pharmacy and Laconia Ave. Pharmacy. She enlisted a third party to serve as the "on paper" owner of Island Pharmacy to mask her involvement in the fraud. Through her pharmacies, the defendant billed Medicare and Medicaid for over $13 million of HIV medication that had been acquired from black-market sources, including medication she purchased from Boris Aminov and Antonio Payano (her co-defendants), and medication that she bought back directly from her own patients. She then dispensed that medication to other patients of her pharmacies.

The defendant knew that the quality and condition of the diverted HIV medication that she was distributing to patients was potentially dangerous. As a result, the defendant and other pharmacy employees who distributed the medication took steps to make the bottles of diverted medication falsely appear that they were new and in proper condition. For example, on October 20, 2020, the defendant sent a WhatsApp message, which attached the photograph below of a bottle of the HIV medication Tivicay to Boris Aminov, in which the defendant explained to Aminov that he had already sold her too many degraded and inauthentic bottles of medication that required alteration in order to appear legitimate, and she was unwilling to take this additional specific bottle because of its especially-poor quality and condition: "I was going to keep it but I really can't ... I already have enough bad ones to work with."[1]



---

[1] All of the messages and photographs referenced in the Government's submission were produced to the defendant in Rule 16 discovery.

In another example from October 21, 2020, the defendant wrote to Aminov, "I don't want that it's not good," along with another photograph of a bottle of diverted HIV medication, as shown below.



Again, on June 7, 2021, in a series of text messages, the defendant instructed Antonio Payano that the medications he was selling to her had to be "cleaned," meaning that the prescription medication bottles had to be stripped of the labels and other information identifying that they had previously been distributed to other patients so that patients of her pharmacy would not know they were being prescribed black-market, diverted medication. The defendant wrote: "please next time you bring it has to be cleaned I can't take it if it's not cleaned," to which Payano responded: "ok I got it."

Moreover, the defendant was aware that the illegal medication she was sourcing and distributing to her patients was causing patients to receive the wrong medications. On September 14, 2021, the defendant texted the following message to Payano: "I can't work with you any more this is the eight bottle my patients open and the wrong pills in it I can get my pharmacy shut down if I keep doing that to my patients." The defendant later wrote to Payano: "I need to get re-embursed asap." To be clear, these messages show that due to the defendant's illegal medication distribution, patients of Corvalan's pharmacies were actually receiving the incorrect medications, and not the medication they were prescribed to treat their HIV infections.

The defendant directed the other pharmacy employees who worked for her in all aspects of the fraud. For example, in the text message thread below, an unindicted co-conspirator asked the defendant a series of questions about how the fraud worked, including what medications they would offer to buy back directly from patients, how to bring up the buy-back program to patients, and how much they would offer patients to buy their medications.



From: [redacted]
Recipient: +17187371767 Christy Corvalan (owner)

Questions:

1) What if I start talking to someone and they're not an HIV patient, do I still get their information?

2) The video was cut off in the beginning so if they transfer pharmacy's that day I give them $25 right?

3) Since I don't know all the medication but back prices, Do I call you if they ask?

4) who's gonna be delivering for my patients, is it me? Or do I just say we have drivers?

5) if they don't mention that they do buybacks how do I bring it up?

6) What if I convince them to transfer or whatever but then we don't take their insurance, do I not write them down?

7) Does it depend what kinda medication they bring if they bring other people's bottle? Like do they get $50 for just any type of bottles

8) Do I have to make sure that tell them that the buy backs are just between us even if they don't ask if they can tell the people in the pharmacy?

••• Most of these I could probably come up with an answer myself but I would rather be sure than to take a guess. •••

| Participant | Delivered | Read | Played |
| --- | --- | --- | --- |
| +17187371767 Christy Corvalan | | | |

Read: 8/20/2020 12:17:16 PM(UTC+0)

8/20/2020 8:03:27 AM(UTC+0)

In the following message, the defendant responded to all of the questions posed to her in the messsage above, providing a detailed roadmap of the fraudulent scheme. Among other things, the defendant provided a complete list of HIV medications that she was seeking to buy back from patients, instructions that should be given to patients to not discuss the program over the phone and to refer to it as the "skittles" program to conceal the medication buy backs she was directing, and that "the object of the game is to make [the patients] trust what u saying" when pharmacy employees offer to buy their patients' medications.



Recipient: +17187371767 Christy Corvalan (owner)

1. No lol u say we specialize in certain medications.

2. yes just cause they send their scripts even doe they not due

3. For prices yes u call me but ima send you a list of the medication we take that's hiv
Genvoya
Triumeq
Biktarvy
Odefsey
Complera
Descovy
Truvada
Isentress
Dovato
Prezista
Tivicay
Symtuza
I will send u more

4. You say u the driver but one of us or u depending we can work that out

5. you ask by the way just want to ask do u participate in the program the program is if u basically sell your meds back sometimes or always but say if u don't it's ok it's just some people do it and u wanted to let them know that u buy it also .

6. yes right it down cause then we can ask them if they mind changing their insurance that's a extra 50 just to change it

7. U tell them if they bring other bottles that are hiv u will give them something basically you will look out u tell them trust me I got u but don't specify a price but it has to be hiv un opened bottle.

8. yes u tell them don't talk about the buy back over any phone tell them say I participate in the skittle program lol .

9. yes like that the object of the game is to make them trust what u saying and give your pharmacy a chance to service them......

| Participant | Delivered | Read | Played |
| --- | --- | --- | --- |
| +17187371767 Christy Corvalan | | | |

Delivered: 8/20/2020 12:28:37 PM(UTC+0)

8/20/2020 12:28:36 PM(UTC+0)

Other messages between the defendant and her daughter Dezyre Baez, David Fernandez and Crystal Medina further show that she was directing the activities of all of her employees in executing the fraud. For example, in a message from November 5, 2020, Baez wrote: "He's doing skittles . . . How much?" The defendant responded: "I believe 200." On March 9, 2021, the defendant wrote to Baez: ""[Medina] gonna give u the bread for all the bags u taking . . . U can come back for skittles if u want." On July 14, 2020, the defendant wrote to Fernandez: "He's doing buy back . . . Francis." Fernandez responded, "Okay . . . how much." The defendant wrote: "225 . . . take out the med . . . before u get there." In another example, on January 30, 2021, the defendant wrote to Fernandez: "Patients – 2,000, Skittles – 4,700 . . . Total 6,700 . . . Take it from the kitchen drawer." This message indicated that Fernandez had to pay patients $2000 in kickback payments and an additional $4700 to buy back their medications.

### d. The Defendant Laundered Proceeds from the Diversion Scheme

Over the duration of the diversion scheme, Corvalan used the Corvalan Pharmacies to pay more than $6 million to Boris Aminov, presumably in exchange for the black-market medication that he sold to her to distribute to her pharmacies' patients. To conceal those payments, Aminov provided the defendant with the information for certain shell companies, to which the defendant wrote handwritten checks from the Corvalan Pharmacies.

For example, the images below are screenshots of WhatsApp messages in which Aminov provided figures typed on a calculator that indicate the amount of money he was owed by the defendant, and the names of shell companies to make those payments to.



In yet another example, on September 15, 2021, the defendant provided a picture of a calculator with the amount "207,522.83" typed out. She then wrote to Aminov: "I'm only sending that but it can't wait 2 weeks . . . I can wait until next week Tuesday or Wednesday." Aminov responded: "Ok . . . Will be done."

*e. Search of Laconia Ave. Pharmacy*

The defendant opened Laconia Ave. Pharmacy in June 2022 after shutting down Island Pharmacy. That pharmacy was searched in connection with a civil lawsuit on August 10, 2022. Additional evidence of the defendant's fraudulent scheme was recovered, including photos of a large bag filled with black-market HIV medications, bottles of used or expired HIV medications, envelopes filled with cash (presumably to make kickback and buy-back payments to the patients), and lighter fluid and other materials used to remove the labels from medication bottles. Photographs of that evidence are below.

 







    *f. Proceeds from the Scheme*

The defendant's involvement in the scheme was motivated by pure greed. She spent the proceeds of the fraud to purchase luxury vehicles, waterfront properties, jewelry and other designer goods on an extraordinary scale.

The defendant bought two waterfront properties totaling $2.4 million, not including significant renovations that were undertaken on each property after the sale. To effectuate the purchases, the defendant first transferred approximately $2.5 million from Island Pharmacy's bank account to her personal bank account. She then transferred approximately $1.7 million from her

bank account to a bank account associated with "Success Re Management, LLC," which is owned by the defendant's daughter Dezyre Baez, and was a shell company created to effectuate the purchases of the waterfront properties with the fraud proceeds. To this day, the defendant appears to insist that these properties are "owned by her daughter," *see* PSR ¶112, although the monetary tracing clearly shows they were purchased directly with fraud proceeds funneled through the pharmacy and her own personal accounts. A photo of the waterfront properties is included below.



The defendant also used the fraud proceeds to purchase a Mercedes Maybach valued at approximately $245,000, shown in the image below that the defendant posted to her social media account.



An analysis of Island Pharmacy's and the defendant's personal bank accounts, and a review of the defendant's social media posts, also show that she used the fraud proceeds to buy $175,000 at a single jewelry store in the Bronx, more than $200,000 on designer clothes and shoes, and among other things, courtside tickets at the Golden State Warriors game during the 2022 NBA finals and visits to "Dr. Miami," a Celebrity Plastic Surgeon, as indicated in the photos below.




The total loss amount attributable to the defendant through her orchestration of this fraud is at least $13,680,724.26. That loss amount is derived from a financial analysis which includes

the billings to Medicaid and Medicare for reimbursements for prescription HIV medications from the defendant's pharmacies, compared with the amount of HIV medication billings to legitimate medication retailers.

### iii. Procedural History

On February 28, 2023, a grand jury returned an indictment charging the defendant with conspiracy to commit wire fraud and health care fraud, in violation of 18 U.S.C. § 1349; conspiracy to violate the anti-kickback statute, in violation of 18 U.S.C. § 371; and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). The defendant was arrested on March 2, 2023 along with four other scheme participants who were affiliated with the Corvalan Pharmacies and Boris Aminov. On October 17, 2023, a grand jury returned a superseding indictment charging the defendant with an additional count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. Six other co-defendants were charged in the Superseding Indictment.

On July 15, 2024, the defendant pleaded guilty to Count One of the Superseding Indictment, specifically conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1349, pursuant to a plea agreement with the Government (the "Plea Agreement"). As part of the Plea Agreement, the defendant stipulated that, as part of the scheme, she caused patients with HIV to receive illegally-sourced, black-market prescription HIV medication and offered to purchase HIV medication from patients who were prescribed that medication to treat their HIV infections, and that the Court may consider that conduct in imposing a sentence.

The Plea Agreement calculated a Guidelines range of 188 to 235 months' imprisonment, based on an offense level of 36 and a criminal history category of I. The Plea Agreement included a stipulated loss amount of $13,680,724.26. The Plea Agreement also contains enhancements for the scheme involving a large number of vulnerable victims, using sophisticated means, and the defendant's role as an organizer or leader of a criminal activity that involved five or more people or was otherwise extensive.

Pursuant to U.S.S.G. §§ 5G1.1(a) and (c), because the statutorily authorized maximum sentence for Count One is 120 months' imprisonment, the parties agreed that the Guidelines sentence is 120 months' imprisonment (the "Stipulated Guidelines Sentence").

On October 3, 2024, the United States Probation Office ("Probation Office") issued its final PSR for the defendant. That report calculated that the defendant was in Criminal History category II, based on past convictions for theft offenses in Pennsylvania, but otherwise agreed on the same Stipulated Guidelines Sentence as that contained in the Plea Agreement. The Probation Office recommends a sentence of 120 months' imprisonment.

### B. Discussion

### i. Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult"

them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

    ii.  <u>A Sentence of at Least 108 Months' Imprisonment Is Appropriate</u>

The Court should impose a sentence of at least 108 months' imprisonment. Such a sentence is necessary given the seriousness of the offense, the need to promote respect for the law and to provide just punishment, to afford adequate deterrence to criminal conduct, and in consideration of the characteristics of the defendant.

    *a.  The Seriousness of the Offense*

The defendant's crimes were extraordinarily serious. The defendant was a leader in a massive fraud that defrauded Medicaid and Medicare of more than $13 million. This was not a garden-variety fraud that posed only financial harm to its victims. On the contrary, the fraud here was uniquely insidious in that it exploited and put at risk vulnerable patients with HIV. These patients needed the medications that were the currency in the defendant's fraud to control their infections. These medications were of vital importance to those patients' health and safety. The defendant profited from the scheme that incentivized these patients, who were often-impoverished, to sell-back their life saving medications in exchange for small but much needed amounts of money. The defendant and others then turned a profit by prescribing those medications to other

unknowing patients, instead of sourcing medication from authorized and legitimate wholesalers. As described above, the defendant reaped significant profits. Typically, a patient would sell their medications for only a few hundred dollars to aggregators on the street or other scheme participants. The pharmacies could then bill Medicaid and Medicare upward of $3,000 for that single monthly prescription. The defendant's conduct was not driven by financial desperation, but instead by greed and a desire to make money. And in that pursuit, the defendant put in jeopardy the health and safety of both the patients who sold back their medication for a small monthly fee, and the patients who were then unknowingly prescribed the black-market diverted medication instead of legitimately-sourced, unadulterated medication.

The defendant enlisted other pharmacy employees—many of whom are co-defendants in this case—into the scheme. She did so at a time when they were young and vulnerable to her influence. She involved her daughter, her daughter's friend, and her fiancé into the scheme when they were all in their early or mid-twenties. She directed their activities and taught them how to engage in all aspects of the scheme, including sourcing the illegal medications from Aminov, Payano and other black-market distributors, submitting fraudulent claims to government insurance programs, altering the appearance of medication bottles to hide the adulterated nature of the medication from her own patients, and making kickback payments. Perhaps most troubling, she developed and directed others in executing the "skittles" program, in which impoverished patients of the pharmacy were encouraged to sell back their medication to further feed the defendant's greed.

The defendant engaged in this insidious fraud not out of need or desperation, but rather to fund a lavish lifestyle, including buying waterfront properties, a luxury car, and designer goods and jewelry.

In sum, the defendant played a vital role as a leader in a massive scheme that put vulnerable patients with a life-threatening illness in danger. She encouraged numerous other co-conspirators to engage in the same. A sentence of at least 108 months' imprisonment is needed to account for this conduct.

### b. The Defendant's Sentence Must Provide Adequate Specific and General Deterrence

The scheme employed sophisticated means and was difficult to detect. The defendant paid shell companies to hide the proceeds of the fraud. The defendant closed and opened pharmacies so that irregular billing patterns would not be detected and to seek to evade detection from law enforcement. Additionally, the defendant developed special knowledge and skills regarding the cleaning and re-packaging of prescription medication bottles so that the fraud would go unnoticed from the patients receiving the black-market medication. A substantial sentence is needed to demonstrate that when these types of sophisticated criminal enterprises are detected and disrupted, the consequences will be severe. An appropriate sentence must also send a message that frauds such as these that specifically prey upon vulnerable individuals will be met with a substantial prison sentence.

The defendant already received a substantial benefit in being offered a plea agreement that limited her maximum exposure to 10 years' imprisonment. The defendant's exposure under the applicable Guidelines were much higher than that. The defendant was indicted on two other counts that carried maximum sentences of 20 years' imprisonment, specifically conspiracy to commit wire fraud and conspiracy to commit money laundering. The defendant's plea agreement already provided her a significant benefit in consideration of the applicable Guidelines range and her incredibly serious and harmful fraud. Even accounting for the mitigating factors raised by the defendant in her sentencing submission, including instances of abuse and neglect in her childhood, any further reduction in sentence would not achieve the aims of sentencing.

A sentence of at least 108 months also will protect against unwarranted sentencing disparities with other co-defendants. The Government indicated to the Court at the sentencing of Boris Aminov that Aminov was at the top of the indictment and was the most culpable defendant in the overall fraud scheme. That is because Aminov's conduct touched on multiple pharmacies and included a widespread medication distribution operation. The Government requested a sentence of 120 months for Aminov, and the Court sentenced him to 108 months. The Government believes a sentence of at least 108 months is likewise appropriate for the defendant. While her activities do not appear to be as widespread as Aminov's, she nonetheless is responsible for a similar loss figure from the fraudulent billings submitted directly from her pharmacies. She also enlisted several other young people to engage in the fraud and directed their activities. She also directly violated the trust of her pharmacies' patients by distributing to them adulterated medication, and by directly buying from them the medications that they needed to treat their HIV infections. Finally, she flaunted her enormous fraudulent profits by buying ostentatious luxury goods and displaying her ill-gotten gains on social media.

## C. Conclusion

The defendant's sentence must reflect the uniquely harmful fraud that she led and organized. It must provide adequate deterrence to those that contemplate similar harmful conduct that exploits vulnerable HIV patients. A sentence of at least 108 months is sufficient but not greater than necessary to achieve the purposes of sentencing in this case.[2]

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by: _____
Jeffrey W. Coyle
Jackie Delligatti
Assistant United States Attorneys
(212) 637-2437 / 2559

Cc: Aaron Mysliwiec, Esq.

---

[2] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).